# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **UNITED STATES FIDELITY AND GUARANTY COMPANY, DISCOVER REINSURANCE COMPANY, and DISCOVERY MANAGERS, LTD.,** | : | |
| **Plaintiffs,** | : | **No. 3:01CV2018 (DJS)** |
| | : | |
| **v.** | : | |
| | : | |
| **S.B. PHILLIPS COMPANY, INC.,** | : | |
| **Defendant.** | : | |

## <u>MEMORANDUM OF DECISION</u>

Plaintiff United States Fidelity and Guaranty Company has moved for summary judgment on all counts of the complaint. Plaintiffs United States Fidelity and Guaranty Company, Discover Reinsurance Company and Discovery Managers, Ltd., in their capacities as counterclaim defendants, have moved for summary judgement on some of the counterclaims brought by both the defendant, S.B. Phillips Company, and defendant's CEO Sam Phillips. Discover Reinsurance Company and Discovery Managers, Ltd have also moved to voluntarily dismiss their claims.[1] The motion for summary judgment **[doc. #197]** is **GRANTED in part**, and the motion to dismiss **[doc. #201]** is **GRANTED,** for the following reasons.

## <u>Facts</u>

This action arises out of a contract for the provision of insurance. Plaintiff United States Fidelity and Guaranty Company ("USF&G") is an insurance company organized under Maryland

---

[1] Discover Reinsurance and Discovery Managers have essentially asked the court to dismiss them as plaintiffs for lack of standing.

law. Defendant S.B. Phillips Company, Inc. ("S.B. Phillips") is a family-owned South Carolina corporation engaged primarily in the provision of temporary staffing services throughout the southeast region of the United States. As a result of its core business operations, S.B. Phillips is required to have large amounts of insurance coverage, especially workers' compensation insurance. During the 1990s, S.B. Phillips decided to explore options for reducing the rising costs of obtaining insurance. Marsh USA, Inc, an insurance brokerage firm incorporated in Delaware and operating in South Carolina, was retained by S.B. Phillips in 1996 for this purpose.

S.B. Phillips asked Marsh, in early 1999, to find insurance options that would lower the cost of insurance through monetary credit for S.B. Phillips's successful efforts to reduce the risk of its employees and, accordingly, the risk of loss under its insurance policies. Marsh contacted Discovery Mangers, Ltd. ("Discovery") a Connecticut based subsidiary of Discover Re Managers, Inc. ("Discover Re"). Discover Re is a wholly owned subsidiary of USF&G, consisting of three separate companies engaged in the underwriting and reinsurance or a certain brand of high-risk insurance policies called Alternative Risk Transfer vehicles ("ARTs") . Discovery handles the underwriting and issuance of insurance policies. Discover Reinsurance Company ("Discover"), an Indiana corporation that reinsures the policies underwritten by Discovery, is also wholly owned by Discover Re and, in its turn, USF&G. All of the Discover Re companies operate out of facilities located in Farmington, Connecticut.

Discovery is licensed by USF&G to underwrite ARTs, including the species of policy known as a self-funded retention ("SFR"), so-called because these policies require the insured to pay a very large deductible on any claims. Marsh and Discovery approached S.B. Phillips and discussed the benefits of the SFR insurance policies with the defendant's CEO, Sam Phillips

-2-

("Sam"), and his son, Blanton Phillips ("Blanton"), the COO. Discovery's representative, Kristina Landini ("Landini"), met with Sam and Blanton on March 11, 1999 at the S.B. Phillips offices in Greenville, South Carolina. Also present at the meeting was Brian Morgan ("Morgan"), a representative of Marsh.  Landini explained the parameters of the SFR program and also touted the virtues of a captive insurance company, an off-shore company owned by the insured that would provide numerous tax benefits of an unspecified nature. Critically for this case, Landini informed Sam and Blanton that security might be required to indemnify USF&G against any losses incurred up to the amount of the self-funded retention. According to Blanton, Landini said the security would "probably" be a one-year issue and any collateral offered by S.B. Phillips would not be held indefinitely. Sam and Blanton both testified that they understood the need for security to be a limited requirement subject to elimination after one year, although neither man can state precisely who gave them this impression. Marsh and its agents are credited as the source of the Phillips' beliefs regarding the collateral.

A second meeting was held in Greenville in April, although the record is not clear regarding who attended the second meeting. Other than the March 11 meeting, it appears that all communication between S.B. Phillips and Discovery, throughout the course of the events underlying this litigation, took place indirectly through Marsh, which works with S.B. Phillips's risk manager, Kara DeBorde ("DeBorde"). Generally, either Sam or Blanton would tell DeBorde their concerns regarding the insurance situation and DeBorde would transmit those concerns to agents of Marsh who then worked with Discovery and Discover to resolve disputes. The impressions Sam and Blanton developed about the security and collateral arose as a result of this communication process.

The plan developed by Marsh and Discovery worked in the following manner. S.B. Phillips, under the insurance policy issued in 1999, received insurance subject to a $250,000 deductible (the self-funded retention) per claim. No premiums were required for this policy, but S.B. Phillips was required to indemnify USF&G for all losses that might occur within the SFR. Discover reinsured USF&G for all losses and, pursuant to their reinsurance agreement, was entitled to all benefits, and fully assumed all risks, under the insurance contract and Indemnity Agreement. A similar arrangement existed under the renewed insurance policies issued in 2000.

S.B. Phillips, during April 1999, decided to purchase an SFR product from USF&G. Marsh and Discovery worked out the details that have already been described. Discovery issued policies, in USF&G's name, for worker's compensation insurance, general liability insurance and errors and omissions insurance effective for a period of one year from April 30, 1999. The worker's compensation policies had a $250,000 deductible and the general liability policies had a $200,000 deductible.[2] Discovery, upon completion of an internal audit of S.B. Phillips's finances decided that the company was not a suitable candidate for an SFR product, although this conclusion was, at least based on the record, not made known to S.B. Phillips and it did not stop Discovery from selling the SFR policies to the defendant. Approximately two weeks after the policies went into effect, Discovery sent Marsh a copy of the Indemnity Agreement that included the description of the collateral required to secure the SFR.

Apparently as a result of the review of S.B. Phillips's finances, Discovery determined that a much larger amount of security would be required than Sam or Blanton had understood to be

---

[2]No security was required under the general liability policies. The security and collateral served only to guarantee the SFR under the worker's compensation policies.

necessary. The Indemnity Agreement called for a $1.9 million security in the form of an

"evergreen" letter of credit, so-called because it can be drawn on by the beneficiary at any time

for any reason. Sam and Blanton testified that they were surprised and shocked by the amount of

the security, but they felt constrained by their legal obligation to carry insurance, since any

rejection of the Indemnity Agreement would end their insurance coverage and, simultaneously,

their legal ability to do business as a temporary staffing agency. Further, Sam and Blanton

believed the security would be reduced after one year, although the express terms of the

Indemnity Agreement did not provide for such a reduction. Again, Sam and Blanton claim to be

relying on general statements of reassurance made by Discovery, through Marsh. S.B. Phillips

signed the Indemnity Agreement and arranged for the Branch Banking & Trust Company

("BB&T") to provide the letter of credit, which was issued on May 26, 1999, with Discover

Reinsurance as the beneficiary.

A similar pattern of events occurred in April 2000, when the initial policies were subject

to renewal. S.B. Phillips was informed, close to the expiration of its insurance, that a much larger

amount of security would be required for the second year of coverage, in spite of S.B. Phillips's

work to hold claims to a minimum. Plaintiffs required an additional $2,509,175 as security for

the re-issuance of the insurance policies. S.B. Phillips agreed to provide the increased security,

and USF&G agreed to amend the Indemnity Agreement, although the parties do not present these

changes as a reciprocal arrangement. The exact result of Amendment No. 1, which took effect

April 30, 2000, is the subject of this lawsuit. There is no dispute that BB&T renewed the initial

letter of credit and also issued a second letter of credit on April 27, 2000, with Discover as the

beneficiary of both.

S.B. Phillips, its assets encumbered as collateral for the letters of credit, began to search for a new insurance provider in early 2001, and the active relationship between USF&G and S.B. Phillips ended in May 2001. The Indemnity Agreement was amended a second time, on May 1, 2001, to reflect an extension of the coverage period under the second insurance policy from May 1, 2001 to May 15, 2001. No further security was requested at the enactment of Amendment No. 2, although S.B. Phillips was required to maintain security under the now expired insurance contracts covering the period from April 30, 1999 to May 15, 2001. Discovery reviewed the security required under the first insurance policies at this time and determined that the $1.9 million sum could be reduced to $1.2 million. BB&T replaced the original letter of credit with a new letter for $1.2 million on May 15, 2001, again with Discover as the beneficiary.

The continued maintenance of the letters of credit became the sole basis for the interactions of USF&G and S.B. Phillips. Discovery reviewed the outstanding security as required by the Indemnity Agreement in May 2002 and informed S.B. Phillips that the total security could be reduced to $1,951,786. BB&T issued a new letter of credit, replacing both the $1.2 million letter and the approximately $2.5 million letter, on May 24, 2002. The new letter of credit identified USF&G as the beneficiary, replacing Discover Reinsurance. The letter of credit was amended on July 8, 2002 to reflect yet another downward revision of the security, to $1,164,286 million. Again, USF&G was the named beneficiary.

On November 26, 2002, for reasons that are not explained in the record, Discover attempted to draw down the July 2002 letter of credit in the amount of $1,005,525. Throughout the period from May 2001 to May 2003, S.B. Phillips was in almost constant conflict with USF&G and Discover regarding the amount of security required. USF&G repeatedly threatened

to draw down the letter of credit if S.B. Phillips refused to authorize a new letter each year when the security was renewed. The record does not say if Discover's actions were related to one of these disputes, although such an inference is not unreasonable when the facts are taken in a light most favorable to the defendant. The money was paid, after some dispute regarding the proper bank account into which the money should be deposited. According to testimony in the record, the money was not properly segregated but was instead commingled, temporarily, with money held generally by Discover. The money was eventually returned, in full, to Sam Phillips, although the reasons for this action are not explained in the record. The money was returned to Sam rather than to S.B. Phillips because, at some point after 1999, Sam Phillips began to provide the collateral for the letters of credit with his personal assets.

S.B. Phillips changed bankers in 2002 and the new bank, First Citizen's Bank, issued a new letter of credit on December 19, 2002.[3] This letter, in the amount of $1,005,525, named USF&G as the beneficiary. The maturity of the December 19 letter of credit was extended, in April 2003, to May 31, 2003 and again extended, on May 30, to November 30, 2003. The amount secured by the letter of credit was reduced on May 30, 2003 to $624,598.

<u>**Standard of Review**</u>

Summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

---

[3]It is possible to infer that Discover Reinsurance drew on the letter of credit because BB&T refused to issue a new letter of credit as a result of its impending loss of business with S.B. Phillips. This conclusion may be inferred from, but is not stated in, the record.

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" American Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981) (quoting Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975)).

A dispute concerning a material fact is genuine "'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court must view all inferences and ambiguities in a light most favorable to the nonmoving party. See Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Id.

## DISCUSSION

Plaintiff USF&G seeks summary judgment on Counts One and Two of the Complaint. Plaintiffs Discover and Discovery have moved the court to dismiss Counts One and Two of the Complaint and Counts One and Two of the Counterclaim on the grounds that Discover and Discovery are not in privity of contract with S.B. Phillips and thus can neither sue nor be sued on the contract. All three plaintiffs, in their capacities as counterclaim defendants, move for summary judgment on Counts Three through Nine and Eleven through Eighteen of the Counterclaim.[4]

---

[4]The plaintiffs have made all arguments for summary judgment jointly unless it is specifically noted otherwise. For the sake of simplicity, plaintiffs will be referred to collectively

## I. Discover's and Discovery's Motion to Dismiss

Discover Reinsurance and Discovery Management, Ltd., have submitted a motion to dismiss their claims for a declaratory judgment and for damages under Counts One and Two of the Complaint. Plaintiffs' basis for their motion is unusual. Discover and Discovery now claim that, because they lack privity of contract with S.B. Phillips, they do not have standing to sue on the contract. See, Tomlinson v. Board of Education of the City of Bristol, 226 Conn. 704, 718 (1993). Thus, plaintiffs argue, the court must accept their motion to dismiss pursuant to F.R.C.P. 41(a)(2). If the plaintiffs' motion is granted, they will remain as parties only in their capacities as counterclaim defendants to the claims brought by S.B. Phillips and Sam Phillips.

The motion is unusual because it is typically the defendant that moves to dismiss an action when, as Discover and Discovery contend, the cause of action is brought by a party not in privity of contract with the defendant. Here, the defendant, S.B. Phillips, is in the position of arguing that Discover and Discovery are entitled to sue and be sued on the contract. If plaintiffs' motion is denied, the effect will be to award Discover and Discovery legal rights that they presently disown.

It is an undisputed principle of Connecticut law that a contract for reinsurance does not give rise to a right of action by the insured against the reinsurer, unless there is a specific contractual provision that recognizes such a right. Brogan v. Macklin, 126 Conn. 92, 94 (1939). The basis for this rule is the lack of privity between the reinsurer and the insured. Travelers Indemnity Co. v. Household International, Inc, 775 F.Supp. 518, 526 n.10 (D.Conn. 1991)(holding that a parent company of a subsidiary insurer was not the real party of interest in

---

as USF&G when discussing their joint motion.

place of the subsidiary that was the actual issuer of the insurance policy, in spite of a reinsurance agreement giving rights and duties to the parent company). Similarly, in Connecticut "an agent is not liable where, acting within the scope of his authority, he contracts with a third party for a known principal." Rich-Taubman Associates v. Commissioner of Revenue Services, 236 Conn. 613, 619 (1996).

Discover, pursuant to the reinsurance agreement, holds all the risk and all the benefits incurred by USF&G under the insurance policies and Indemnity Agreement, but there is nothing in either the policies or the Agreement that creates privity of contract between S.B. Phillips and Discover. The mere existence of the reinsurance agreement is insufficient to create privity of contract without something more, and nothing more can here be found. Discovery, acting to sell and underwrite insurance policies on behalf of USF&G, is an agent of USF&G and USF&G was clearly disclosed as the principal, bringing Discovery within the scope of the general rule of law exempting agents from liability. Connecticut law plainly instructs that Discover and Discovery cannot sue on the insurance policies unless there is explicit language in the policies, or in other contracts between the parties, that authorizes such a cause of action.

S.B. Phillips argues that the court has equitable powers to keep Discover and Discovery in the case as plaintiffs, but there is no basis in the record for a holding that the plaintiffs are estopped from dismissing their claims. Implicitly, S.B. Phillips is contending that Discover and Discovery are parties in interest under F.R.C.P. 17(a)[5] and therefore they must be retained as plaintiffs. The rule that a claim must be prosecuted by the real party in interest is intended to

---

[5]"Every action shall be prosecuted in the name of the real party in interest." F.R.C.P. 17(a).

protect "individuals from harassment and multiple suits by persons who would not be bound by

the principles of claim preclusion if they were not prevented from bringing the subsequent

actions." 6A Wright, Miller & Kane, *Federal Practice and Procedure* §1541, at 322 (2d ed.

1990). There is no danger to the defendant in this action that Discover and Discovery may bring

further suits on the same transactions if USF&G loses on its claims. Discovery, as the agent of

USF&G, has no independent right to sue on the contract. Discover also has no right to enforce

the contract, despite the assignment clause contained in the reinsurance agreement, because the

reinsurer is not in privity with the insured. <u>Brogan</u>, 126 Conn. at 94. The resolution of USF&G's

claims against S.B. Phillips will resolve, finally, any interest that Discover or Discovery have in

this case. The purpose of Rule 17(a) is satisfied and there is no basis for the court to hold either

Discover or Discovery in the case as plaintiffs against their wishes. The motion to voluntarily

dismiss Counts One and Two of Complaint is granted.

Finally, the issue remains as to the viability of S.B. Phillips's contract-based

counterclaims against Discover and Discovery. The plaintiffs are not parties to the insurance

policies or the Indemnity Agreement, nor do they have any rights to enforce those agreements.

Absent privity of contract there is no standing to bring an action on the contract and the claims

must be dismissed. Similarly, S.B. Phillips has no standing to sue non-parties to the agreement

for breach of the agreement. The court lacks subject matter jurisdiction when the plaintiff has no

standing to pursue the action. <u>In re Catholic Conference</u>, 885 F.2d 1020, 1023 (2d Cir. 1989). A

federal court must dismiss a claim, and may do so sua sponte, whenever it is established that the

court lacks subject matter jurisdiction. <u>Westmoreland Capital Corp. v. Findlay</u>, 100 F.3d 263,

266 (2d Cir. 1996). The lack of privity is therefore fatal to Counts One and Two of the

counterclaim to the extent that those counts state causes of action based on contract against Discover and Discovery. The claims against Discover and Discovery are therefore dismissed for lack of subject matter jurisdiction pursuant to F.R.C.P. 12(h) and F.R.C.P. 41(b).[6]

Discover and Discovery are terminated as plaintiffs in this action.

## II. Plaintiff's Motion for Summary Judgment on the Complaint

USF&G, as the party named on the insurance policy and the signatory to the Indemnity Agreement, has privity of contract with S.B. Phillips and can both sue and be sued on the contract at issue in this action. USF&G remains in the case as a plaintiff and its claims are not affected by the dismissal of Discover and Discovery as plaintiffs.

### A. Count One–Declaratory Judgment

USF&G moves for summary judgment on its claims for a declaratory judgment and damages arising out of an alleged breach of contract. USF&G and S.B. Phillips entered into an Idemnity Agreement dated April 30, 1999 ("the Agreement"). The Indemnity Agreement was subsequently amended twice. Amendment No. 1 ("the Amendment") took effect on April 30, 2000 and Amendment No. 2 became effective on May 1, 2001. This action is predicated on a dispute between the parties about the meaning of certain provisions of Amendment No. 1 to the Indemnity Agreement.

Count One of USF&G's complaint seeks a declaratory judgment that it was not required, by the terms of the Indemnity Agreement, to review and possibly reduce the amount of the

---

[6]The court notes that it is a precondition of dismissal pursuant to Rule 41(a)(2) that the voluntary dismissal not lead to the dismissal of counterclaims filed prior to the motion to voluntarily dismiss. F.R.C.P. 41(a)(2). The requirement of the rule does not, however, permit the court to retain a claim over which it lacks subject matter jurisdiction.

security provided by S.B. Phillips until April 30, 2002. Defendant contends that Amendment No. 1 to the Indemnity Agreement accelerated the original time-table for review and possible reduction of the security so that USF&G was obligated to reduce the amount of security on April 30, 2001. The parties agree that Connecticut law governs the interpretation of the Indemnity Agreement and Amendment No. 1.

Under Connecticut law, the intention of the parties is controlling and must be gathered from the language of the [contract] in light of the circumstances surrounding its execution. Peter-Michael, Inc. v. Sea Shell Associates, 244 Conn. 269, 275 (1998). Intention is determined by the language of the contract, the circumstances of formation, and the motives and purposes of the parties. Sartor v. Town of Manchester, 312 F.Supp.2d 238, 243 (D.Conn. 2004). The contractual language must be given its ordinary meaning unless some special meaning is clearly intended. Id. Finally, the contract must be construed as a whole so that every provision is given effect, if reasonably possible. Id.

Generally, contractual intent is a question of fact, but it can be a question of law for the court when the contractual language is clear and unambiguous. Sartor, 312 F.Supp.2d at 243. "If the agreement is subject to more than one reasonable interpretation and extrinsic evidence of the actual intent of the parties exists, then the contract's meaning becomes an issue for the factfinder." Brunoli v. Brunoli & Sons, 993 F.Supp. 66, 73 (D.Conn. 1997). When the terms of a contract containing a valid merger clause are unambiguous, the introduction of extrinsic evidence of intent will be barred. Tallmadge Brothers Inc. v. Iroquois Gas Transmission System, L.P., 252 Conn. 479, 503-504 (2000). A contract's language is presumed to be unambiguous when the contract is a commercial agreement between sophisticated parties. Id. at 496. The critical

-13-

underlying issue is whether the terms of the Indemnity Agreement and Amendment No. 1 are clear and unambiguous such that the intent of the parties can be determined as a matter of law.

The Indemnity Agreement establishes the rights and duties of the insurer and the insured under the SFR program. The document covers such issues as the amount of required security, the terms and conditions for determining the security and reducing it and the calculation of premiums and other fees. The First Count of USF&G's complaint deals strictly with those provisions of the Agreement governing the timing of USF&G's review of the security provided by S.B. Phillips to guarantee the SFR.

The clause entitled "Decreases," found at Paragraph C(2) of Section VI of the Indemnity Agreement, guarantees to S.B. Philips that the amount of the security will be reviewed on the second anniversary of the termination date of the underlying insurance policy, and reduced if certain conditions are satisfied. There is no dispute that security under the first policy, covering the period from April 30, 1999 to April 30, 2000, was subject to review as of April 30, 2002 under the unmodified Indemnity Agreement.

The terms under governing reduction of the security were altered by Amendment No. 1. The Amendment was executed in conjunction with the second insurance policy, on April 30, 2000. According to Amendment No. 1, decreases may occur as of the first anniversary of the termination of the policy.[7] There is no language in Amendment No. 1 that restricts its effect on the Indemnity Agreement to only those insurance policies issued on or after April 30, 2000.

_____

[7]Amendment No. 1 reads, in relevant part, "[A]s of the first anniversary of the termination date of the Policy and on each anniversary thereafter, Company will allow a reduction in the then current amount of security if such amount is greater than the Retention Obligations valued at such anniversary dates."

The Indemnity Agreement contains a valid merger clause. The clause reads, in relevant part, "[t]his Agreement supersedes all previous Indemnity Agreements between Company and Insured as to the subject matter covered by this Agreement, and any prior statements, agreements or representations between the parties are terminated and no longer of any force and effect." The terms of the merger clause were not altered or affected by either Amendment No. 1 or Amendment No. 2 and the clause remains applicable to the entire contract, as amended.

USF&G argues that the terms of the contract are unambiguous. According to the plaintiff, Amendment No. 1 actually creates two distinct Indemnity Agreements with different prescriptions for the reduction of the security provided by S.B. Phillips. The original, unmodified Indemnity Agreement applies to the first policy, in effect from April 30, 1999 to April 30, 2000, while the amended Indemnity Agreement creates a new deadline for review of the security produced in conjunction with the second policy, in effect from April 30 2000 to April 30, 2001. USF&G attempts to provide textual evidence in support of this claim.

First, plaintiff argues that the execution date of the Amendment, April 30, 2000, is a clear sign that it was meant to apply only to the insurance policy executed on that date, although no language in the amendment fits this interpretation. Second, USF&G claims that the "pooling provision" in the amendment is a clue that the parties intended Amendment No. 1 to merge the time of review for the security required under both the first and second insurance policies by accelerating the review of the security for the second policy. Again, there is nothing in the "pooling provision" that limits application of the amendment. Finally, plaintiff argues that because the amendment alters the schedule of policies to include the second policy but does not mention the first policy, Amendment No. 1 must apply to only the second policy. There is no

language in the paragraph amending Schedule A that limits application of the amended Indemnity Agreement to only the second policy.

S.B. Phillips contends that the contractual language is clearly ambiguous because it can have an alternate interpretation. Defendant alternately claims, in a footnote, that it is entitled to summary judgment on this issue because, in fact, the language of Amendment No. 1 is not ambiguous and it requires a review and possible reduction of collateral on April 30, 2001.

The language of the Indemnity Agreement as amended is clear and unambiguous. Ultimately, none of the parties claim that the provision altering the date on which the collateral is reviewed from two years after termination to one year is actually subject to multiple interpretations. The change is obvious and not disputed. The meaning of the language is not subject to debate; rather the scope of the amended contract is disputed. Ambiguity must "emanate from the language of the contract rather that on party's subjective perception of the terms." Tallmadge, 252 Conn. at 498. The parties have a subjective dispute, rather than a textual one and therefore the question of contractual meaning is a matter of law.

The fact that, here, contractual meaning is a question of law does not necessarily lead to the conclusion that USF&G is correct as to the meaning of the contract. The execution date of the amendment offers no insight into the meaning of the contract. The fact that the Indemnity Agreement was amended when the second policy took effect is proof only of dissatisfaction with the Agreement as originally conceived. An amendment alters the original agreement, it does not create an alternate agreement in competition with the original.

A failure to mention the first policy in the amendment is also evidence of nothing. The section amending Schedule A is titled "Schedule A is amended to add the following additional

Policy." This meaning is clear and unambiguous. Schedule A existed in one form until April 30, 2000 and then it was amended to include new and previously absent information. Obviously there is no need to include the information already contained in Schedule A because the schedule is being supplemented, not replaced. The second policy is now covered under the Indemnity Agreement in addition to any policies already covered. The absence of any mention of the first policy in the amendment is logical because the first policy is addressed in the original Indemnity Agreement and does not need to be reviewed in the Amendment.

The pooling provision is equally unconvincing as proof of an intent to split the Indemnity Agreement. The reference to all of the security as a single entity, when read in conjunction with the other portions of Amendment No. 1, is best understood as an application of the amended Indemnity Agreement to both policies, rather than as the creation of two separate Indemnity Agreements. Indeed, if the Amendment were intended to create a competing agreement it would make much more sense to refer to the second policy with specificity in each amendment or alteration. The language of Amendment No. 1 conspicuously fails to include any limits or specific applications. The Amendment can be clearly read as an alteration of the original Agreement as that Agreement applies to both the first and second insurance policies, not as an effort to split the original Agreement in two.

USF&G does not claim that the merger clause should not apply or that extrinsic evidence exists to support its desired interpretation. Plaintiff attempts to foist a meaning on the text of Amendment No. 1 that simply does not fit. The language of the Amendment is clear and it alters the terms of the original Indemnity Agreement. There is only one Agreement and it applies with equal force to both policies. A court may sua sponte grant a motion for summary judgment in

favor of the non-moving party, just as if a cross-motion for summary judgment had been filed, so long as the record is sufficiently developed that the moving party suffers no prejudice as a result of the decision. <u>Coach Leatherware Co., Inc. v. AnnTaylor, Inc.</u>, 933 F.2d 162, 167 (2d Cir. 1991). USF&G has submitted a reply brief that does not address S.B. Phillips' claim for summary judgment. It is impossible to say that plaintiff would be prejudiced where it has failed to respond to a claim of which it has notice.[8] The terms of Amendment No. 1 alter the "Decreases" clause of the Indemnity Agreement to require a review and reduction of the collateral one year from the termination of the relevant policy. Thus, USF&G was obligated to review the security posted by S.B. Phillips in conjunction with the first insurance policy on April 30, 2001. The plaintiff's motion for summary judgment is denied on Count One and summary judgment is granted to S.B. Phillips.

### B. Count Two—Damages

USF&G has also moved for summary judgment on Count Two of its complaint. Plaintiff seeks $114,933 in unpaid premiums, together with prejudgment interest, allegedly owed under the 1999 insurance policy. The policy guarantees that the annual premium S.B. Phillips must pay will be determined by USF&G's manuals of "rules, rates, rating plans and classifications." The manuals are subject to change at any time. Premium payments must be paid at the time specified by USF&G. The final premium payment is determined after termination of the policy by

---

[8]USF&G did claim that S.B. Phillips was barred from arguing that it was entitled to a favorable ruling because of a contradictory allegation included in one of its counterclaims. The court finds no merit in this argument. It is absolutely true, and undisputed by the parties, that S.B. Phillips was entitled to a review and possible reduction of all security on May 15, 2002. The fact that some review would be required on the undisputed date does nothing to preclude a finding that review of the security was actually required at an earlier date.

reference to the actual expenditures that are considered as part of the premium basis, rather than the estimates used in the policy. USF&G is both authorized and required to conduct an audit of S.B. Phillips's records for the purpose of assembling the information needed to issue the final premium amount. Plaintiff retains the right to conduct the audit at any time up to three years after the policy period ends.

USF&G claims that it conducted an audit in late 2000 and determined that the outstanding premium on the first policy was $139,351. According to DeBorde, the director of risk management for S.B. Phillips, the audit statement reflects Discovery's assessment of the premium S.B. Phillips owed on the insurance policy. Marsh also calculated a premium, one that DeBorde said was more accurate than Discovery's proposal.  DeBorde testified that S.B. Phillips had not been billed for the premium and this was the reason USF&G had not been paid. Subsequently, USF&G adopted Marsh's premium calculation, in the amount of $114,933, and submitted an invoice for this sum. S.B. Phillips refused to pay the invoice and that refusal spawned the present action.

Taking all facts and inferences in the light most favorable to S.B. Phillips, a reasonable juror could conclude either that the audit and premium calculation violated the contract or that the amount of the premium is wrong. There is no testimony from the auditor and nothing in the record that explains when the audit was conducted, what records were consulted or the methods used to derive the amount of the premium. The letters attached to the alleged audit report also suggest that USF&G did not actually review S.B. Phillips's business records as required by the contract. The letters, from Marsh to Discovery, disclose Marsh's disagreement with the amount of the premium and include offers from Marsh to produce S.B. Phillips's company records for

review, a process, arguably, that was contractually obligated to occur prior to determination of the outstanding premium.

The record is too much in doubt regarding the sum owed by S.B. Phillips to grant summary judgment. There are clear issues of fact related to the calculation of the premium and the amount of the premium. Drawing all inferences in a light most favorable to the defendant, a reasonable fact-finder could conclude that USF&G did not meet its contractual obligation when determining the amount of the premium and thus has not yet identified the correct amount owed by S.B. Phillips. Further, although DeBorde testified that Marsh had accurately calculated the premium, it is not clear that she was qualified to make this assessment, that her statement is accurate or that S.B. Phillips is obligated to pay the premium even if accurately calculated. The record presented to the court does not satisfactorily resolve all material issues of fact in dispute. Summary judgment on Count Two of the Complaint is denied.

## II. Counterclaim Defendants' Motion for Summary Judgment on the Counterclaims

USF&G, Discovery and Discover, in their capacities as counterclaim defendants, have moved for summary judgment on Counts Three through Nine and Eleven through Eighteen of the Second Amended Counterclaim. They argue that South Carolina law governs the tort claims brought by S.B. Phillips and that under South Carolina law summary judgment is warranted. Counterclaim plaintiffs[9] oppose summary judgment. S.B. Phillips contends that Connecticut law governs the tort claims and that genuine issues of material fact exist which preclude summary

---

[9]Sam Phillips is named as a counterclaim plaintiff, although he is not named as a defendant in the original action. All arguments made by both Sam Phillips and S.B. Phillips will be treated as brought by S.B. Phillips unless otherwise noted.

judgment.

### 1. South Carolina Law Controls

A federal court sitting in diversity applies the law of the forum state. Erie R.R.Co. v. Tompkins, 304 U.S. 64 (1928). This rule applies as well to the laws and rules governing the choice of law to apply when that choice is uncertain. Klaxon Co. v. Stentor Elec. Mfg. Co., Inc., 313 U.S. 487 (1941). Thus, the choice of a Connecticut forum ensures that Connecticut's choice of law will guide this court to the appropriate substantive law.

Connecticut law honors contractual choice of law agreements except when certain conditions are present. Elgar v. Elgar, 238 Conn. 839, 848 (1996). Such provisions are, however, limited in scope by their terms. Connecticut's courts have held that "narrowly drawn choice of law provisions do not preclude causes of action under the laws of another state where such causes of action are not based in contract." Messler v. Barnes Group, Inc., No. CV 960560004, 24 Conn. L. Rptr. 107, 1999 WL 61034, *9 (Conn.Super. Feb. 1, 1999). A tort claim, even one that is closely related to the subject matter of the contract, may be brought even where it would be barred under the law of the state applied to similar contract claims under the contractual choice of law agreement. See, Greystone Cmty. Reinvestment Assocs. v. First Union Nat'l Bank, No. 3:00CV871, 2002 WL 229901, *2 (D.Conn. 2002). Connecticut courts have adopted the reasoning of New York law that distinguishes between provisions that govern controversies 'arising out of or relating to' a contract, (see, Turtur v. Rothschild Registry International, Inc., 26 F.3d 304, 309-310 (2d Cir. 1994)) and those contracts that are "governed by and construed in accordance with" the laws of a state. See, Krock v. Lipsay, 97 F.3d 640, 645 (2d Cir. 1996). The latter type of contract is deemed too narrow to apply to tort claims related to the contract.

<u>Blakeslee Arpaia Chapman, Inc. v. Helmsman</u>, No. 443753, 31 Conn.L.Rptr. 214, 2002 WL

172670, *2-3 (Conn.Super. Jan. 9, 2002); <u>see also</u>, <u>Greystone</u>, 2002 WL at *2.

The Indemnity Agreement, disputes over which are the source of the present action, contains two clauses that purport to govern forum selection and the choice of law. The forum selection clause, entitled "Consent to Jurisdiction," instructs that in "any legal action, suit or proceeding" that "arises out of or relates to this Agreement" the parties submit themselves to the jurisdiction of state or federal courts located in Connecticut. The choice of law provision, entitled "Applicable Law," reads "[t]his Agreement shall be governed by and construed in accordance with the laws of the State of Connecticut, without regard to its rules regarding conflict of laws." S.B. Phillips urges this court to interpret the forum selection clause as a binding agreement by the parties to apply Connecticut law to all claims arising out of or related to the Indemnity Agreement, but this argument is unsatisfactory.

There is no legal basis for this court to disregard the language contained in the choice of law clause in favor of the language used in the forum selection clause. The two clauses serve different purposes, and both are applicable in the present action. The forum selection clause ensures that all tort claims must be brought in a Connecticut court and be subject to Connecticut choice-of-law law. That purpose has been satisfied in this case, where the parties are present in Connecticut despite numerous, and somewhat more logical, connections to South Carolina. The counterclaim plaintiffs' effort to convert the forum selection clause into a choice of law clause might have merit if a choice of law clause did not exist. Here, the choice of law clause does exist and it uses language that is quite different from the forum selection clause. The agreement is "governed by and construed in accordance with" the laws of Connecticut, and such narrow

choice of law provisions have repeatedly been deemed too narrow to encompass tort claims

arising out of contract-related transactions. The choice of law clause must be given its proper

effect, which is to render the tort claims subject to Connecticut's common law choice of law

analysis.

The traditional choice of law rule in Connecticut is *lex loci delicti* which directs the court

to apply the law of the state where the injury or accident occurred. O'Connor v. O'Connor, 201

Conn. 633, 637 (1986). The state Supreme Court has abandoned a categorical approach to this

rule in favor of the Restatement (Second) of Choice of Law whenever *lex loci delicti* "would

produce an arbitrary, irrational result." O'Connor, 201 Conn. at 650. Recently, courts applying

Connecticut choice-of-law law have used the Restatement approach even where *lex loci* would

lead to the same result. Svege v. Mercedes Benz Credit Corp., 182 F.Supp.2d 226, 229 (D.Conn.

2002); see, Williams v. State Farm Mutual, 229 Conn. 359 (1994) (applied Restatement to a

motor vehicle accident and held that state where accident occurred had the most significant

relationship with the parties). This court will follow the trend and apply the Restatement analysis

adopted by the Connecticut Supreme Court in O'Connor.

The O'Connor court adopted § 145 of the Restatement Second which provides that "the

rights and liabilities of the parties with respect to an issue in tort are determined by the local law

of the state which, with respect to that issue, has the most significant relationship to the

occurrence and the parties under the principles stated in § 6."[10] 1 Restatement (Second), Conflict

---

[10]Section 6 considers the needs of the federal system; the relevant policies of the forum
and other interested states; the comparative interests of the states; the protection of justified
expectations; the policies underlying the field of law; predictability and uniformity; and the ease
in determining and applying the law.

of Laws § 145(1). A four-pronged analysis is used to apply the principles of § 6. Courts consider: (a) the place of the injury; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered. 1 Restatement (Second), Conflict of Laws §145(2).  It is the significance of the contacts with respect to each issue, not the number of contacts, that governs the choice of law. O'Connor, 201 Conn. at 652-653.

The contacts present in the record, both in quantity and quality, lead convincingly to the application of South Carolina law to the non-contract claims. The insurance contracts and the Indemnity Agreement were created in South Carolina and arranged by a South Carolina-based broker for a South Carolina business. The injuries allegedly suffered by the counter-claim plaintiffs occurred in South Carolina. The insurance policies covered activities that occurred in South Carolina and other southeastern states. Finally, any state law interest that might be implicated in this action–regarding the fiduciary duty or marketing obligations of an insurance broker, reinsurer or insurance underwriter–belongs to South Carolina, where the policy was sold and the insured is located.

S.B. Phillips asserts that Connecticut has more significant contacts with this case than South Carolina does, but that assertion is not substantiated. Discovery, the underwriter of the insurance policies, and Discover, the reinsurer of USF&G, are Connecticut-based companies, and undoubtedly they have a legitimate interest in the outcome of this case, but that interest alone is insufficient to make Connecticut law applicable to the non-contract claims. Even if the court assumes that Discovery and Discover, not USF&G, are the real parties in interest, as S.B. Phillips

implicitly argues, it remains a fact that Discovery was doing business in South Carolina when it sold insurance to the defendants, and South Carolina is the locus of the relationship between the parties.

### 2.  CUIPA and CUTPA Claims are Dismissed

S.B. Phillips brings four counterclaims for damages under the Connecticut Unfair Trade Practices Act ("CUTPA") and the Connecticut Unfair Insurance Practices Act ("CUIPA"). These claims are based on Connecticut statutory law and may not be brought pursuant to the law of any other state. The application of South Carolina law to all non-contract claims in this action is fatal to Counterclaim Counts Eight and Fifteen (CUIPA) and Counts Nine and Sixteen (CUTPA). Summary judgment is granted to the counterclaim defendants on all four counts.

### 3. Claims for Estoppel, Misrepresentation and Fraud

Counts Four through Seven and Eleven through Fourteen of the Counterclaim state claims for promissory estoppel, negligent misrepresentation, fraudulent misrepresentation and fraud in the inducement. USF&G argues that these eight claims should be dismissed because: a) the existence of the Indemnity Agreement and the Agreement's merger clause forecloses claims for damages based on oral statements that contradict the terms of the Agreement; and b) the record is devoid of actionable statements that support the claims. Neither contention is adequate to win summary judgment.

The existence of the Indemnity Agreement and the merger clause do not serve as any barrier to the claims for promissory estoppel, negligent or fraudulent misrepresentation or fraud in the inducement. USF&G argues that under Connecticut law a plaintiff may not rely on oral promises that contradict the terms of the written contract. Further, USF&G cites the terms of the

merger clause, which purports to terminate any prior agreements, as evidence that the parties intended to be bound solely by the Agreement. USF&G is correct that a valid merger clause terminates the effect of all prior oral agreements, but that is not the issue here. Counterclaim plaintiff alleges that it was induced by misrepresentations to enter the contract. S.B. Phillips does not argue that an alternate deal exists, rather, it claims that it was tricked into accepting the present arrangement.

USF&G would apply Connecticut law to bar claims that it has already argued should be governed by South Carolina law. Counterclaim defendants cannot have choice of law both ways, with Connecticut law applied when South Carolina law is inconvenient. Connecticut law governs the interpretation of the Indemnity Agreement and all claims sounding in contract. The effect of the contract on the tort claims is not, however, governed by Connecticut law unless there is a dispute regarding the meaning of the contract, and no such dispute exists in relation to the tort counterclaims. South Carolina law governs the tort claims, and under South Carolina law a merger clause is not a valid defense to claims of fraud and misrepresentation.

The South Carolina Supreme Court has held that if the contract "was procured by words and with a fraudulent intent of the party claiming under it, then parole evidence is competent to prove the facts which constitute the fraud." Allen-Parker Co. v. Lollis, 257 S.C. 266, 272 (S.C. 1971). A party may offer testimony to prove the alleged fraud even when the testimony varies the terms of the written instrument, when the instrument was procured as a result of the fraud charged. Id. This rule applies even in the face of a merger clause or a clause disclaiming liability. See, Slack v. James, 356 S.C. 479, 483 (S.C.Ct.App. 2003), cert. granted, October 6, 2004. The reliance of S.B. Phillips may prove unreasonable under the law, and the proofs of fraud may be

insufficient, but the defendant is entitled under South Carolina law to bring the evidence before the fact-finder regardless of the Indemnity Agreement.

USF&G also argues that a cause of action for promissory estoppel is barred by the existence of a coterminous contractual claim. The promissory estoppel claims are not barred solely because a breach of contract claim exists. Under South Carolina law, an action for breach of contract is separate and distinct from an action for promissory estoppel and a judgment on one does estop a party from raising the other. Link v. School District of Pickens County, 302 S.C. 1, 7 (S.C. 1990). The South Carolina Supreme Court has held that promissory estoppel is not a contract substitute; rather it is an equitable remedy that can exist whenever the requirements of equity are satisfied. Duke Power Co. v. S.C. Pub. Serv. Comm'n, 284 S.C. 81, 100-101 (S.C. 1985). A cause of action for promissory estoppel exists whenever there is a promise, even without consideration, and "it was intended that the promise should be relied upon and in fact it was relied upon, and if a refusal to enforce it would be virtually to sanction the perpetration of a fraud or would result in other injustice." Higgins Construction Co., Inc. v. Southern Bell Tel. & Tel. Co., 276 S.C. 663, 665-666 (S.C. 1981). The elements of a promissory estoppel claim have since been refined, but they continue to require no more than the existence of a promise and the expected and reasonable reliance of the injured party. White v. Roche Biomedical La., Inc., 807 U.S. F.Supp. 1212, 1217 (D.S.C. 1992).

Absent a legal bar to the counterclaims at issue, USF&G contends that the record lacks sufficient factual evidence to support S.B. Phillips. A negligent misrepresentation claim requires proof that the defendant made a false representation, in favor of his pecuniary interest and in breach of a duty of care to be truthful, that plaintiff justifiably relied upon, causing plaintiff to

suffer a pecuniary loss. <u>Tom Hughes Marine, Inc. v. American Honda Motor Co.</u>, 219 F.3d 321, 324 n.2 (4th Cir. 2000). Fraudulent misrepresentation and fraudulent inducement share common elements. Both require, generally, a showing that the defendant knowingly or recklessly made a false material representation to the plaintiff, without the plaintiff knowing of the falsehood, for the purpose of inducing the plaintiff to reasonably rely on the misrepresentation so that the plaintiff thereby would be caused harm. <u>M.B. Kahn Construction Co. v. South Carolina National Bank</u>, 275 S.C. 381, 384 (S.C. 1980); <u>Tom Hughes</u>, 219 F.3d at 324 n.2.

The evidence in the record shows that genuine issues of material fact preclude summary judgment on the eight tort claims challenged by USF&G. Counterclaim plaintiffs identify two categories of false or misleading statements that support their claims: 1)Landini's statements during the March 1999 meeting at S.B. Phillips's office; and 2) the statements made by Landini to Marsh and the statements made by Marsh to S.B. Phillips. Although Landini's statements, taken alone, are not necessarily indicative of a promise, the record as a whole could reasonably support a juror's conclusion that Marsh and Discovery made false representations to S.B. Phillips regarding the nature of the insurance program and the amount of collateral the defendant would need to provide. The critical issue of fact concerns Marsh's status as either the agent of S.B. Phillips or the agent of Discovery and USF&G.  If Marsh is an agent of S.B. Phillips, then no action can be maintained against the counterclaim defendants based on Marsh's actions. Conversely, if Marsh was acting as the undisclosed agent of Discover, Discovery and USF&G, then Marsh's statements could expose the counterclaim defendants to liability. There is sufficient doubt as to Marsh's status to permit the issues of fraud and misrepresentation to be heard at trial. Assuming that a jury finds Marsh to be an agent of Discovery, it could be reasonable to award

damages to S.B. Phillips on those claims.

Under South Carolina law an insurance broker such as Marsh is treated as an agent of the insured. Hiott v. Guaranty National Insurance Company, 329 S.C. 522, 530 (S.C. Ct. App. 1997). However, when there is evidence that would permit an inference that the broker was acting at the instance or request of the insurer, the broker may be treated as an agent of the insurance company under South Carolina Code Ann. §38-43-10 (1989). Under §38-43-10 as it existed between 1999 and 2003, a broker who "takes or transmits other than for himself an application for insurance or a policy of insurance to or from an insurer," §38-43-10(b), or who "receives or delivers a policy of insurance of an insurer," §38-43-10(d), or who "receives, collects or transmits any premium of insurance," §38-43-10(e), is considered an agent of the insurer, even if the broker is formally engaged by the insured. Although there are few decisions holding a broker to be an agent of the insurer, see, Republic Textile Equip. Co. v. Aetna Ins. Co., 293 S.C. 381, 383 (S.C.Ct.App. 1987)(holding that where the insurance company reissued a policy after consulting solely with the broker, the broker could reasonably be considered the agent of the insurer), the facts of this case could permit a reasonable jury to infer that Marsh was the agent of Discovery and USF&G.

The record is filled with emails and correspondence showing that, much like the broker in Republic Textile, Discovery negotiated premiums and security solely in consultation with Marsh. Internal emails show that Discovery employees discussed the need for Marsh to "convince" S.B. Phillips of the need to acquiesce to Discovery's proposals. Further, the record shows that Marsh collected premiums, delivered the insurance policies and conducted financial surveys of S.B. Phillips that aided Discovery in its business. The statements of Marsh employees regarding the amount of the security and the length of time a security would be required can also be inferred as

representations urged by Discovery for the purpose of securing a client, rather than as a disinterested business appraisal such as an insured might expect from its agent. South Carolina law provides that whether an agency relationship exists and the scope of the alleged relationship are questions of fact for a jury. Holmes v. McKay, 334 S.C. 433, 439 (S.C.Ct.App. 1999). There are sufficient issues of fact regarding the relationship between Marsh and Discovery to make the agency relationship a question for the jury.

The inference that Marsh was the agent of Discovery, drawn here most favorably to the non-moving party, is sufficient to permit the presentation of all questions of misrepresentation, fraud and estoppel to a jury. Although it might be unreasonable to conclude that Landini's direct statements at the March 1999 meeting, alone, are enough to sustain the tort claims, the complete record, taken in the light most favorable to S.B. Phillips, does contain sufficient evidence. Landini's statements to S.B. Phillips, coupled with her statements to Marsh and Marsh's statements to S.B. Phillips could reasonably be construed as misleading and it could have been reasonable for S.B. Phillips to rely on those representations when deciding to seek insurance from USF&G and Discovery. Once the policies were issued S.B. Phillips had no choice but to accept the terms of the Indemnity Agreement, even if those terms varied from the prior representations of Landini and Marsh. S.B. Phillips must, obviously, prove its allegations at trial, but when the inferences are drawn fully in its favor, summary judgment must be denied as to the tort claims in Counts Four through Seven and Eleven through Fourteen of the Second Amended Counterclaim.

### 4. Claim for Breach of Fiduciary Duty

Under South Carolina law, an applicant for insurance does not automatically stand in a

fiduciary relationship with the insurer. <u>Pitts v. Jackson National Life Ins. Co.</u>, 352 S.C. 319, 330-332 (S.C.Ct.App. 2002)(citing <u>Gordon v. Fidelity & Cas. Co. of N.Y.</u>, 238 S.C. 438 (S.C. 1961)). The very limited instances where a fiduciary relationship has been found between an insurer and an insured all involve a breach of the covenant of good faith and fair dealing that exists as a result of the completed insurance contract. <u>Tadlock Painting Company v. Maryland Casualty Company</u>, 322 S.C. 498, 503 n.5 (S.C. 1996). The claim raised by S.B. Phillips in this action is not entirely clear. Defendant does not explain whether the breach of fiduciary duty is founded on the actions of USF&G and Discover regarding the security after the formation of the insurance contract, where a claim might exist, or whether the breach is based on actions prior to the issuance of the policy, where a claim probably could not exist. The South Carolina courts have "carefully refrained from defining the particular instances of fiduciary relationship in such a manner that other and perhaps new cases might be excluded and have refused to set any bounds to the circumstances out of which a fiduciary relationship might spring." <u>Island Car Wash Inc. v. Norris</u>, 292 S.C. 595, 599 (S.C.Ct.App. 1987). The facts, drawn most favorably to S.B. Phillips, could, pursuant to <u>Tadlock</u>, sustain a claim for a breach of the fiduciary duty owed by USF&G as the custodian of the security offered by S.B. Phillips. There are certainly disputed issues of fact as to USF&G's fulfillment of its contractual obligations regarding the security, and this is enough to deny summary judgment.

### 5. Claim for Unjust Enrichment

Count Seventeen of the Second Amended Counterclaim states a claim for unjust enrichment. The parties have presented the court with a novel issue of law regarding the nature of a claim for unjust enrichment. According to USF&G, unjust enrichment, or quantum meruit as it

is called in South Carolina, is a claim sounding in tort, and therefore South Carolina law applies. S.B. Phillips argues that unjust enrichment is a contract claim governed by Connecticut law. A review of both South Carolina law and Connecticut law reveals that the court does not need to decide the nature of the claim or resolve the choice of law dilemma. Under the law of either state, a claim for unjust enrichment or quantum meruit may not be brought when an express contract exists and the contract provides an adequate remedy at law. See, United Coastal Industries, Inc. v. Clearheart Construction Co., Inc., 71 Conn.App. 506, 512-513 (Conn.App.Ct. 2002); Gantt v. Morgan, 18 S.E.2d 672, 673 (S.C. 1942). The claim for unjust enrichment in this action is based on the security, required by the contract between the parties and guaranteed by, at various times, both S.B. Phillips and Sam Phillips. Although the exact nature of the enrichment is not certain, defendant makes very clear that the claim is based on the posting of the letters of credit, a condition of the contract that is clearly governed by the contract. Assuming, arguendo, that USF&G somehow misused the security, improperly calculated the security or otherwise gained an improper benefit as a result of its actions under the contract, the proper remedy would be one for breach of contract and not for unjust enrichment. The record shows that a claim for either unjust enrichment under Connecticut law or for quantum meruit under South Carolina law is barred by the Indemnity Agreement. Summary judgment is granted for the counterclaim defendants on Count Seventeen of the counterclaim.

### 6. Claim for Conversion

Sam Phillips alleges conversion of property based on USF&G's assignment of its interest in the contractually mandated letters of credit to Discover. Assignment, according to the defendant, is contractually prohibited and therefore USF&G has converted Sam Phillips's

property by permitting Discover to claim a right to receive the property to the exclusion of Sam

Phillips. Further, Sam Phillips contends that when Discover drew down slightly more than

$1,000,000 on the letter of credit the effect was to convert his property.

South Carolina law provides that conversion is the "unauthorized assumption and

exercise of the right of ownership over goods or personal chattels belonging to another, to the

alteration of their condition or the exclusion of the owner's rights." Green v. Waidner, 284 S.C.

35, 37 (S.C.Ct.App. 1984). The plaintiff must prove either title or right to possession of the

property at the time of the conversion. Oxford Finance Companies, Inc. v. Burgess, 303 S.C. 534,

539 (S.C. 1991). "There can be no conversion of money unless there is an obligation on the

defendant to deliver a specific, identifiable sum to the plaintiff." Richardson's Restaurants, Inc.

v. National Bank of South Carolina, 304 S.C. 289, 294 (S.C.Ct.App. 1991). The record does not

sustain the claim of conversion.

Initially, the court notes that there is a clear factual question regarding Discover's rights

to draw on the letter of credit when USF&G was the only named beneficiary. It may be that

Discover's claimed right to the letter of credit, based on USF&G's assignment, was a violation of

the Indemnity Agreement and therefore was improper. Assuming this version of the facts, highly

favorable to S.B. Phillips and Sam Phillips, is correct, there is still insufficient support for the

conversion claim. There is no factual doubt that USF&G had the legal right to draw down the

"evergreen" letter of credit at any time and for any reason. Sam Phillips cannot show that he was

entitled to possession of the money in question because the letter of credit, by its very existence,

denies him exclusive use of his property. Indeed, Sam Phillips repeatedly testified that his

inability to have free use of his cash assets was one of the major reasons he sought to reduce the

amount of the required security. Further, even if Sam proved that Discover or USF&G had no right to draw upon the letter of credit, the record is clear that the money was subsequently returned to him, at which time it was once again pledged as collateral to secure yet another letter of credit with USF&G as the beneficiary. It cannot be proved that USF&G excluded Sam Phillips from his right to the property—property that was subsequently returned in full without loss of value. The record, even with all inferences drawn in Sam Phillips's favor, cannot support a reasonable fact-finder's conclusion that a conversion occurred. Summary judgment is granted to the counterclaim defendants on this issue.

## **CONCLUSION**

The motion by plaintiffs Discover and Discovery to voluntarily dismiss their claims pursuant to F.R.C.P. 41(a)(2) **[doc. #201]** is **GRANTED**. Neither Discover nor Discovery is in privity of contract with the defendant and therefore neither can sue on the contract. Counts One and Two of the Complaint are dismissed to the extent that they are brought by Discover or Discovery. Accordingly, Discover and Discovery are dismissed as plaintiffs. The holding that Discover and Discovery lack privity of contract with S.B. Phillips also eliminates the basis for S.B. Phillips' contract claims against those two companies. The court, pursuant to F.R.C.P. 12(h) and F.R.C.P. 41(b), dismisses Counts One and Two of the Counterclaim to the extent they state causes of action against Discover or Discovery.

The motion for summary judgment by USF&G in its capacity as a plaintiff is denied. The terms of Amendment No. 1 and the Indemnity Agreement are unambiguous and the claim for a declaratory judgment is properly subject to resolution as a matter of law. The court holds that the Indemnity Agreement, as modified by Amendment No. 1, required USF&G to review and

possibly reduce the amount of security, and by extension the amount of collateral, posted by S.B. Phillips to secure the SFR on each insurance policy as of the first anniversary of the termination of the policy. As a result, USF&G was obligated to review the security maintained by S.B. Phillips under the first insurance policy no later than April 30, 2001, the first anniversary of the termination of that policy. Summary judgment is granted to the defendant, S.B. Phillips, on this claim. Further, there exist sufficient issues of material fact regarding the premium payment allegedly owed by S.B. Phillips to deny summary judgment on Count Two of the Complaint.

Finally, the joint motion for summary judgment filed by USF&G, Discover and Discovery in their capacities as counterclaim defendants **[doc. #197]** is **GRANTED in part**. The terms of the Indemnity Agreement do not require the application of Connecticut law to the various tort counterclaims brought by S.B. Phillips and Sam Phillips. The law of this court's forum state, Connecticut, leads to the application of South Carolina law to all non-contract claims in this action. USF&G is entitled to summary judgment on Counts Eight, Nine, Fifteen, Sixteen, Seventeen and Eighteen of the Counterclaim. Summary judgment is denied as to all other counterclaims.

This case is referred to the Hon. Thomas P. Smith, United States Magistrate Judge, for a settlement conference. The parties are **ORDERED** to submit a joint trial memorandum on or before April 29, 2005.

**IT IS SO ORDERED** at Hartford, Connecticut, this __8th__ day of March, 2005.

_____
**/s/DJS**
**DOMINIC J. SQUATRITO**
**UNITED STATES DISTRICT JUDGE**
